[L.A. No. 29827. In Bank. Aug. 30, 1971.]

JAMES S. RYMAN, JR., et al.,
Plaintiffs and Appellants, v.
AMERICAN NATIONAL INSURANCE COMPANY,
Defendant and Respondent.

## COUNSEL

Hurwitz, Hurwitz & Remer, Franklin I. Remer, Robert R. Hurwitz and James B. MacDonald for Plaintiffs and Appellants.

Garrett & Dimino, David W. Young and Franklin J. Dimino for Defendant and Respondent.

## OPINION

**TOBRINER, J.**—Plaintiffs James and Joan Ryman, injured in an automobile accident on November 11, 1966, instituted this action against defendant American National Insurance Company to recover medical and hospital benefits under an insurance policy issued by the insurer. The company defended on the ground that the policy had lapsed for nonpayment of premium prior to the date on which the injuries had been incurred; plaintiffs claimed that the policy had been reinstated at the time of the accident, alleging that the insurance company had accepted a late-tendered premium more than a week before the accident occurred. The parties submitted the issue of coverage to the trial court on the basis of a written statement of stipulated facts, and on this record the court entered judgment for defendant insurer. Plaintiffs now appeal from that adverse judgment.

As discussed below, we have concluded, on two independent grounds, that under the stipulated facts the policy in question was in effect at the time of the accident. First, under the terms of the reinstatement provision included in the policy, a mandatory provision required by statute, the policy is automatically reinstated if the company accepts a payment of an overdue premium without issuing a conditional receipt and without requiring an application for reinstatement. In this case the company did initially accept a late payment tendered by plaintiffs, and not until several weeks later did the company notify plaintiffs that its initial acceptance was only a conditional one; under these circumstances, the policy was reinstated upon acceptance and was in force on the date of the accident.

Second, past decisions have established that in California, as in a majority of states, an insured enjoys a contractual right to reinstatement of an insurance contract, which accrues whenever the insured satisfies the reasonable preconditions to reinstatement; once the insured meets these requirements the insurance company cannot arbitrarily refuse reinstatement. In the instant case the stipulated facts reveal that, at the time they applied for reinstatement by tendering payment of the single overdue premium, the insureds were fully insurable; under our case law the insureds were then entitled to reinstatement, and the insurer could not thereafter refuse reinstatement on the basis of their subsequent accident.

### 1. The facts.

The insurance policy in question is a "Family Major Medical Expense Policy" issued by the defendant insurer to plaintiffs on June 17, 1965.[1] The

---

[1] The policy designated James Ryman as the "named insured" and Joan, his wife,

policy called for a quarterly premium of $61.54 payable in advance, and provided for a 31-day grace period, following the premium due date. During the grace period the policy remained fully in force, and the insured could pay the premium without penalty. Plaintiffs had paid all premiums either before the due date or within the grace period up to and including the premium due June 17, 1966. The premium due September 17, 1966, was not paid when due, however, and although defendant insurer mailed the insureds a premium due reminder between September 27 and October 2, giving September 17th as the due date, the insureds did not mail the premium check before the 31-day grace period expired on October 18, 1966. Plaintiffs concede that the policy initially lapsed after October 18, 1966, for nonpayment of premium.

Plaintiffs contend, however, that subsequent events reinstated their policy so that the policy was in force on the date of their accident; in this regard, the chronology of the parties' actions takes on particular significance.

On October 31, 1966, less than two weeks after the expiration of the grace period, Mrs. Ryman mailed a check for $61.54 to defendant; the amount of the check constituted a full quarterly premium payment. The insurance company received this check on November 2, 1966, at its home office[2] and immediately deposited the check in the company's general commercial bank account, in the same manner as it had done with all of the insureds' prior timely payments. Although defendant then credited the payment to its own "suspense file" rather than to plaintiffs' regular account, the company at this time sent no notice to the Rymans indicating either that the tendered payment had only been accepted "conditionally," or that some further action would be required by the insureds in order to have their policy reinstated.

Instead, on November 8, 1966, six days after the insurer had received and deposited plaintiffs' check, the company mailed the insureds a "Notice of Lapse," which read: *"Our records show the past due premium has not been paid and your policy is lapsed."* (Italics added.) This notice also stated that the policy would be considered for reinstatement if the insureds

as a "covered dependent." James paid an increased premium to obtain a "guaranteed renewable rider," which guaranteed that he could renew the policy without further evidence of insurability until age 65.

[2] Plaintiffs mailed the check to the company's Health Insurance Division, in St. Louis, Missouri, the location designated by defendant for payment of premiums. All previous payments had been paid to this office and all subsequent communications from the insurer, in connection with plaintiffs' present claim, were sent from this department.

completed the application on the reverse side of the notice and returned it to the company "with payment for the amount of premium due." The application for reinstatement included a provision in fine print which read: "I agree that any reinstatement of said policy shall be in accordance with and subject to the terms of the policy and that it shall not be considered or reinstated until this application for reinstatement shall be accepted and approved officially by American National."

Plaintiffs received this communication on November 10 and Mrs. Ryman immediately mailed the following letter to the insurer: "Received 'Notice of Lapse' today. I mailed Sept. 17, 1966 payment for $61.54 Oct. 31, 1966, check no. 584. Have you received it? Or otherwise notified me immediately. [Par.] According to my records there will be another payment of $61.54 due Nov. 17, 1966."[3] The parties stipulated that "[a]t all times prior to and including November 10, 1966, the Rymans were in good health."

The following day, November 11, 1966, both Mr. and Mrs. Ryman were seriously injured in an automobile accident and were incapacitated for several weeks thereafter. Medical expenses arising from the accident totalled $15,389.47, and the parties agreed that if the insurance policy was in effect, the total benefits due would be $12,431.58. The parties also stipulated that at the time of the accident plaintiffs did not carry any other health or accident insurance.

On November 17, 1966, while the Rymans were still hospitalized, Joan's mother forwarded another check for $61.54 to defendant on behalf of the Rymans. Once again the company deposited this check in its general account upon receipt, credited its suspense file, but did not mail any notice to the insureds indicating a "conditional acceptance."

On November 22, 1966, nearly three weeks after receiving and depositing the Rymans' October 31st check, the company wrote a letter to the insureds stating that the payment made on October 31 could not be accepted "at this time" as it was received after the grace period, but that plaintiffs might apply for reinstatement on a form on the back of the letter. Such application, the correspondence promised, would be considered promptly; if not approved, the insureds' premium payment, which the company continued to retain, would then be refunded.

On December 13, 1966, apparently more than three weeks after the

---

[3]The next quarterly payment was actually due on *December* 17, rather than on November 17th, but the company never advised Mrs. Ryman of her mistake and, as related in text *infra,* the insureds next payment was in fact made on November 17.

company's receipt and deposit of the insureds' check of November 17th, the insurer acknowledged receipt of this second remittance and again stated that the payment could not be "credited" since the "requirements to consider reinstatement," i.e., the reinstatement application, had not been received. The company, however, continued to retain this payment also and stated that upon the insureds' submission of an application and the company's approval of reinstatement the policy would be paid "to March 17, 1967."

On January 31, 1967, three months after the Rymans had sent defendant their initial late premium payment, the company finally mailed the insureds a check for $123.08 as a refund for the two remittances. On February 16, 1967, upon advice of counsel, the Rymans submitted a completed reinstatement application form to defendant; the form revealed that in January 1966 Joan had undergone an operation for a hernia with "no complications," and was accompanied by a letter indicating that reinstatement was sought only on the basis that it be made retroactive prior to November 11, 1966. The letter also clearly stated that by execution of the documents Mr. and Mrs. Ryman neither conceded cancellation nor waived any claim they might have under the policy, "including a claim that the policy was in fact in effect at the time of their accident of November 11, 1966." The insureds enclosed the check for $123.08 they had just received from the insurer. On March 13, 1967, the company notified the insureds that their application for reinstatement had been denied; the insurer also denied any liability with respect to medical expenses resulting from the November 11th accident. This litigation followed.

Both parties agree that the policy initially lapsed when plaintiffs failed to pay the September 17th premium by October 18th, and thus the question of whether the policy was in effect on November 11th, the date of the accident, turns solely on whether the policy was reinstated prior to that date.[4] Defendant contends that substantial evidence supports the trial court's "factual" determination that the company never "unconditionally" accepted the premium payments tendered by the insureds, and thus that the policy, by its terms, was not reinstated.

For the reasons discussed below, we have concluded that when the insurer initially accepted and deposited plaintiffs' October 31, 1966, check

[4]Since their accident did not occur until after they had sought reinstatement, plaintiffs did not find it necessary to allege that the insurer had "waived" its right to claim an initial lapse of the policy. Thus we have no occasion to decide in the instant case whether the insurer by its actions subsequent to October 18th, might have waived any right to declare a forfeiture of the policy. (Cf. *Murray* v. *Home Benefit Life Assn.* (1891) 90 Cal. 402 [27 P. 309]; *Page* v. *Washington Mut. Life Assn.* (1942) 20 Cal.2d 234, 243 [125 P.2d 20]; *Peterson* v. *Allstate Ins. Co.* (1958) 164 Cal.App.2d 517, 521 [330 P.2d 843].)

without condition on November 2, the policy was reinstated as a matter of law. Since the instant accident occurred on November 11, the policy was in full force and effect on the date of the accident and the insurer cannot escape liability for medical expenses accruing from that accident. Moreover, even if we assume the company did not "accept" the tendered premium on November 2, it could not thereafter refuse reinstatement simply on the basis of a subsequent accident since plaintiffs were fully insurable and had tendered all back premiums at the time they applied for reinstatement.

■ 2. *By depositing plaintiffs' check upon receipt, before apprising the insured (1) that the money was being retained conditionally, and (2) that an application would be required for reinstatement, the insurer "accepted" the premium within the meaning of the policy and the policy was immediately reinstated.*

Pursuant to the terms of section 10350.4 of the Insurance Code,[5] the policy issued by defendant included the following provision with respect to reinstatement: "Reinstatement: If any renewal premium be not paid within the time granted the Insured for payment, a subsequent acceptance of premium by the Company or by any agent duly authorized by the Company to accept such premium, without requiring in connection therewith an application for reinstatement, shall reinstate the Policy; provided, however, that if the company or such agent requires an application for reinstatement and issues a conditional receipt for the premium tendered, the Policy will be reinstated upon approval of such application by the Company, or lacking such approval, upon the forty-fifth day following

[5]Section 10350.4 provides: "Reinstatement. A disability policy shall contain a provision which shall be in the form set forth herein. The last sentence of such provision may be omitted from a noncancellable policy.

"Reinstatement: If any renewal premium be not paid within the time granted the insured for payment, a subsequent acceptance of premium by the insurer or by any agent duly authorized by the insurer to accept such premium, without requiring in connection therewith an application for reinstatement, shall reinstate the policy; provided, however, that if the insurer or such agent requires an application for reinstatement and issues a conditional receipt for the premium tendered, the policy will be reinstated upon approval of such application by the insurer, or, lacking such approval, upon the forty-fifth day following the date of such conditional receipt unless the insurer has previously notified the insured in writing of its disapproval of such application. The reinstated policy shall cover only loss resulting from such accidental injury as may be sustained after the date of reinstatement and loss due to such sickness as may begin more than 10 days after such date. In all other respects the insured and insurer shall have the same rights thereunder as they had under the policy immediately before the due date of the defaulted premium, subject to any provisions endorsed hereon or attached hereto in connection with the reinstatement. Any premium accepted in connection with a reinstatement shall be applied to a period for which premium has not been previously paid, but not to any period more than 60 days prior to the date of reinstatement."

the date of such conditional receipt unless the Company has previously notified the Insured in writing of its disapproval of such application. . . ."[6]

Under the terms of this provision, if the insurer accepts a premium after the grace period without requiring an application for reinstatement, the acceptance "shall reinstate the policy" and the insurer forfeits any right it may have to condition reinstatement upon the applicant's insurability.[7] Only when the insurer (1) requires an application for reinstatement and (2) issues a conditional receipt for the premium tendered, does the provision authorize the company to disapprove reinstatement on the basis of the insureds' application.[8]

In the instant case defendant received plaintiffs' check of October 31st on November 2, after the end of the grace period, retained it and deposited it in the company's general commercial checking account, just as it had done when it had accepted all of the insureds' previous premium payments. Although the company was apparently aware that the premium payment was late, since it credited the payment to its "suspense file" rather than to the insureds' regular account, the company did not notify the insureds at this time that it would require them to complete an application for reinstatement. Nor did the insurer "issue a conditional receipt for the premium tendered." In light of the company's past practice, this retention and deposit of the check without qualification constituted an "acceptance" of the premium and, as such, under the explicit terms of the policy, reinstated plaintiffs' coverage. (See *McCary* v. *John Hancock etc. Life Ins. Co.* (1965) 236 Cal.App.2d 501, 508 [46 Cal.Rptr. 121, 23 A.L.R.3d 733]; cf. *Pierson* v. *John Hancock Mut. Life Ins. Co.* (1968) 262 Cal.App.2d 86, 91 [68 Cal.Rptr. 487]; *Equitable Life Assur. Soc.* v. *Brewer* (1928) 225 Ky. 472 [9 S.W.2d 206]. See generally 15 Appleton on Insurance (1944) § 8496, pp. 329-338; 6 Couch on Insurance 2d (1961) § 32:300, pp. 528-529.)

Defendant insurer claims, however, that it is "unrealistic" to consider its initial deposit of the insureds' payment as an immediate acceptance

[6]The complete policy provision followed the text of Insurance Code section 10350.4 explicitly (see fn. 5, *supra.*)

[7]Even if the company does require a formal application and does issue a conditional receipt, the clause provides that if the company fails to notify the insured of its disapproval of the application within 45 days, the insurer loses all right to deny reinstatement for "uninsurability."

[8]As we explain *infra, Kennedy* v. *Occidental Life Ins. Co.* (1941) 18 Cal.2d 627 [117 P.2d 3], makes clear that the policy's statement that reinstatement is subject to the insurer's "approval" cannot mean that the insurer may disapprove reinstatement arbitrarily or in its absolute discretion. This provision must instead be interpreted as giving the insurer the right to refuse reinstatement to those individuals who, on an objective standard, are "uninsurable."

of the premium; instead, it suggests, the company must be permitted to retain a submitted premium for a "reasonable" period of time while it determines whether to accept the payment unconditionally or to require an application for reinstatement. The company apparently bases this argument on the "realities" of the nature of large, modern insurance companies and the consequent limitation on the insurer's ability to give immediate, individual attention to each premium payment it receives. The short answer to defendant's contention is, of course, that the reinstatement procedure incorporated in the policy itself contains no provision for such retention of a tendered premium prior to a decision whether or not to require evidence of insurability through an application for reinstatement.

The accelerating expansion of insurance companies and the proliferation of specialized departments is a completely voluntary development, undertaken by insurers for their own benefit. If an insurer elects to expand its operations to a stage at which it cannot feasibly identify a late payment and issue a conditional receipt before retaining a premium, certainly the *insured* cannot reasonably be required to shoulder the resulting consequences.[9]

Although the insurer urges us to read into the reinstatement provision authorization for its temporary retention of premiums in the above manner, long recognized principles of interpretation counsel against any extrapolation of a policy's literal terms which might increase the risk of a forfeiture by an insured.  ■  As we declared in *Page* v. *Washington Mut. Life Assn.* (1942) 20 Cal.2d 234, 239 [125 P.2d 20]: "Forfeitures, particularly in insurance contracts, are not favored. [Citation.] And if reasonably possible in light of the circumstances, the courts will determine that a forfeiture has not occurred or that a waiver or estoppel exists. [Citations.]"

■  Finally, defendant did considerably more than simply "retain" the insured's check upon receipt; the insurer cashed the check and deposited it in its general commercial checking account, handling the payment in precisely the same manner as it did those payments which it intended to accept unconditionally. To support its claim that its action on November

---

[9]Defendant's practice of retaining and depositing a late premium upon receipt, before deciding whether or not to approve reinstatement, finds a close parallel in the insurance companies' common practice of accepting an initial premium payment before determining whether an applicant is insurable. The observations of one court with respect to this latter practice apply to the instant case as well: " 'It may be inferred . . . that the companies would rather assume a calculated risk in an isolated case such as this, than lose the benefits flowing from the general acceptance of premiums in advance, thus binding and committing the insured immediately to the contract as written.' (*Wood* v. *Metropolitan Life Ins. Co.* [1961] 193 F.Supp. 371, 374.)" (*Brunt* v. *Occidental Life Ins. Co.* (1963) 223 Cal.App.2d 179, 186 [35 Cal.Rptr. 492].)

2 was not an "acceptance," the insurer relies on the fact that it credited the premium to its suspense file rather than to its regular account. Yet the obvious flaws in this position were pointed out by the Court of Appeal in *McCary* v. *John Hancock etc. Life Ins. Co.* (1965) 236 Cal.App.2d 501 [46 Cal.Rptr. 121, 23 A.L.R.3d 733]. The court there noted that "[w]hile the supervisor testified that 'We cashed the check, deposited the money, held the money in suspense,' the Company never advised the Insured that his money was being so held. So far as the Insured was concerned, all he knew was that the check cleared through his bank and was charged against his account in the same manner as his previous checks to the Company had been." (236 Cal.App.2d at p. 507.) This being the case, the *McCary* court concluded: "The fact is that the Company *did accept* payment of the . . . premium. . . ." (Italics added.) (236 Cal.App.2d at p. 508.)

Thus the company's actions on November 2 constituted an acceptance of the late tendered premium which, under the explicit terms of the policy as mandated by statute, "shall reinstate the policy." The policy was therefore in full force and effect on November 11, and the insureds may clearly recover the medical expenses resulting from their injuries of that date.

3. *Since plaintiffs were insurable and had paid the overdue premiums in full at the time of their application for reinstatement, the insurer could not refuse reinstatement on the basis of a later accruing disability.*

Whether or not the company "accepted" their payment on November 2, plaintiffs were entitled to reinstatement of their policy prior to their accident since, at the date of their application for reinstatement, they were insurable and had fully paid their overdue premiums.

The case of *Kennedy* v. *Occidental Life Ins. Co.* (1941) 18 Cal.2d 627 [117 P.2d 3] directly applies to the situation. In *Kennedy,* as in the instant case, the insured had failed to pay a quarterly premium within the grace period, and the policy—a life insurance policy—had lapsed. More than a month thereafter the insured's broker forwarded a check to the insurance company covering the unpaid back premiums;[10] he included an application for reinstatement and a health certificate. The insurer received the payment

---

[10]The broker in *Kennedy* advanced the insured the money for the premium and thus mailed the company his own check as payment. The court in *Kennedy* placed absolutely no significance on the fact that the check was mailed by a broker rather than by the insured himself; the policy called for payment of the premium to the company and the court explicitly did not consider the broker's actions an "acceptance" of the payment on behalf of the company. Defendant, quite correctly, does not assert that the identity of the payor constitutes a relevant distinction between *Kennedy* and the instant case.

the following day, but the insured had already been found dead early that same morning.

The beneficiaries brought suit on the policy claiming that the right to reinstatement was a contractual right which had accrued as soon as the insured had paid the overdue premiums and had furnished satisfactory evidence of insurability; they asserted that the company could not escape liability simply because the insured had died before the insurer had acted upon the application for reinstatement. In response, the company claimed that the application for reinstatement and the submission of the back payments merely constituted an offer by the insured which could not be effective until accepted by the insurance company. In support of its position the company pointed out that the policy itself explicitly provided that reinstatement was contingent upon the insured's furnishing evidence of insurability "satisfactory to the company," and that this requirement would be met only if the company accepted the application for reinstatement. Agreeing with the defendant insurer, the trial court directed a verdict in its favor.

On appeal, this court reversed the judgment. Recognizing that other jurisdictions had divided on the question of whether reinstatement involved an offer for a new contract or the fulfillment of a contractual right under the old policy, Chief Justice Gibson, writing for a unanimous court, explicitly adopted the latter, majority view as the California rule. The court held as a matter of law that "reinstatement . . . does not involve the formation of a new contract. By the terms of the policy the insured is given a right to reinstatement after lapse upon compliance with certain conditions. During the period in which reinstatement is possible the policy is not void but merely suspended. The right to revive the policy by reinstatement is a valuable contractual right, the consideration for which is found in the premiums paid and to be paid under the original policy, and the insurer has no arbitrary or discretionary right to refuse reinstatement if all the conditions therefor have been complied with." (18 Cal.2d at pp. 630-631.) Applying these principles, we held that so long as an insured has complied with the conditions requisite to reinstatement, an insurer could not refuse reinstatement simply because the company had not acted upon a request for reinstatement prior to the insured's death.

The defendant in *Kennedy* claimed, however, that the insured had not complied with all of the conditions for reinstatement, since one of those conditions constituted the furnishing of evidence of insurability "satisfactory to the company;" under this provision, the company asserted, it had reserved the right to refuse reinstatement in its own discretion. The

*Kennedy* court rejected this interpretation of the policy's provision, recognizing that such a reading would effectively return to the company an arbitrary authority to refuse reinstatement, a power the court had just denied. Instead, the court held that the insurer could only require that the applicant furnish evidence demonstrating his insurability on an "objective," rather than subjective, basis.

The court explained, "The overwhelming weight of authority is to the effect that an agreement to reinstate an insurance policy upon 'satisfactory evidence' of insurability does not give the insurer the power to act arbitrarily or capriciously, but that evidence which would be satisfactory to a reasonable insurer is all that is required. [Citations.]" (18 Cal.2d at p. 635.)[11] The *Kennedy* court concluded: "When [the applicant] has submitted evidence of insurability which would be satisfactory to a reasonable person and has paid all the premiums which he would have paid even though the policy had not lapsed, there is no valid reason why his policy should remain suspended while the application goes through the insurer's routine for approval." (18 Cal.2d at pp. 632-633.) (See, e.g., *Froehler* v. *North American Life Ins. Co. of Chicago* (1940) 374 Ill. 17, 23 [27 N.E.2d 833, 836]; *Gressler* v. *New York Life Ins. Co.* (1945) 108 Utah 182, 193 [163 P.2d 324, 329, 164 A.L.R. 1047]; *Illinois Bankers Life Assn.* v. *Palmer* (1935) 176 Okla. 514, 515-516 [56 P.2d 370, 371].)

The applicability of the principles of *Kennedy* to the case at bar seems evident. ■ On October 31, 1966, the Rymans tendered full payment of their back premiums and thereby applied for reinstatement;[12] the company received their check on November 2. The parties have stipulated that throughout this period, and until November 10, 1966, the Rymans were and remained in good health; the company has not contended at trial, or on appeal, that plaintiffs were, for any reason, uninsurable at this time. *Kennedy* teaches that having satisfied these conditions, plaintiffs were entitled to reinstatement; defendant can no more refuse reinstatement on the basis of plaintiffs' subsequent accident than could the insurer in *Kennedy* decline reinstatement because of the insured' subsequent death.[13]

[11]The court in *Kennedy* specifically disapproved language in an earlier Court of Appeal decision, *Greenberg* v. *Continental Cas. Co.* (1938) 24 Cal.App.2d 506, 515-516 [75 P.2d 644], which stated that "satisfactory evidence" of insurability "is purely a private matter addressed to the discretion of those officers of the company charged with the responsibility of determining such question, [*sic*], and is in no sense that judicial discretion which appellate courts have the authority to review."

[12]The policy does not require a formal application form as a necessary prerequisite to reinstatement. Since reinstatement is effected if the company simply accepts a late payment, plaintiffs clearly "applied" for reinstatement by tendering a check for the overdue premium.

[13]Although the reinstatement clause interpreted in *Kennedy* differs in some respects from the provision now required by Insurance Code section 10350.4, defend-

Although defendant concedes that the *Kennedy* case is quite similar to the instant matter, it contends that that decision is not controlling here because the present plaintiffs, unlike the insured in *Kennedy,* had not submitted an application for reinstatement prior to their accident. The insurer admits that if the plaintiffs had completed an application form on or before November 10, 1966, and had mailed it with the letter which they did send to the insurer that day, their case would be indistinguishable from *Kennedy,* and plaintiffs could recover; since plaintiffs failed to complete such application, however, the company claims that they do not fall within the scope of that decision.

We cannot accept this purported distinction for several reasons. First, and most obviously, the insurer cannot complain of the plaintiffs' failure to complete the application form since the responsibility for this omission lies with the *insurer* and not the insureds. The company, upon receipt of the insureds' late premium, failed to give timely, adequate notice that it required a reinstatement application. Instead, the insurer on November 8th mailed the insureds a completely erroneous and confusing notice, stating that "our records show the past due premium has not been paid and your policy is lapsed," when in fact the company had received and deposited plaintiffs' payment six days earlier.

Rather than informing plaintiffs that their check had been received but that they would still be required to complete an application for reinstatement, the company in the November 8th notice misled the insureds into believing that only those who had not yet paid their overdue premiums were required to complete the enclosed application. Since, under the terms of the policy, the insurer retained the option of accepting payment and reinstating without application, plaintiffs had no way of knowing that they, as well as those who had not paid the back premiums, would be required to complete an application. If the insurer had provided plaintiffs with an accurate notice, we may assume that plaintiffs, in good health and obviously insurable, would have completed the form promptly and mailed it to the company; the company cannot complain of the delay precipitated by its own error.

Second, in our view, defendant's argument attributes an undue significance to the reinstatement application *form* rather than the substantive

ant, properly, does not maintain that the modification of language can reasonably be interpreted as affording the insurer greater authority in refusing reinstatement than recognized in *Kennedy*. The provision addressed in *Kennedy* conditioned reinstatement on the insureds' furnishing evidence of insurability "satisfactory to the Company:" the comparable clause of section 10350.4 subjects reinstatement to the "company's approval" of the application. There is no substantive difference between the variant phrasing.

factor of *insurability*.  ■ ■   As our decision in *Kennedy* made clear, the insured's right to reinstatement upon satisfaction of reasonable conditions constitutes a valuable contractual right for which the insured pays consideration; the insured deserves reinstatement whenever he satisfies those conditions. We believe that the Rymans fulfilled all these conditions on October 31, when they applied for reinstatement, paid all the premiums which were due, and were "objectively" insurable; consequently on that date they became entitled to reinstatement.[14]

The circumstances of the instant case illustrate the wisdom of the *Kennedy* rule—measuring insurability on an objective standard and as of the date of the application for reinstatement—more clearly than the facts of the *Kennedy* case itself. In *Kennedy* the insured died *before* the insurer received his premium payment, and thus at no time did the company retain the insured's payment during a period of decision as to reinstating the policy. In the instant case, in contrast, the insurer received plaintiffs' premium on November 2, did not notify the insureds that their premium was being retained conditionally until November 22, and thereafter claimed the authority to refuse reinstatement. If an insured's right to reinstatement was not objectively determinable as of the date the insured applied for reinstatement, as *Kennedy* dictates, and if instead the company, while retaining the insured's premium, preserved an option to either approve or disapprove of reinstatement in its absolute discretion, the insurance company would gain an unconscionable advantage: it would in effect collect the premiums but assume no risk of loss. (Cf. Ins. Code, § 480.)

■ A procedure that gives the insurer complete discretion to accept or reject applications for reinstatement while retaining tendered premiums is clearly inequitable. If, on the one hand, the risk against which the individual wants insurance does not occur during the time the company ponders over the application, the insurer can approve reinstatement and retain the insured's premium for coverage ostensibly provided over that span of time. If, on the other hand, the very risk against which an insured seeks protection should eventuate during this decision-making period, the company, exercising its absolute discretion, can simply deny reinstate-

---

[14]Of course, we do not suggest that an insurance company cannot require applicants for reinstatement to complete forms evidencing their "insurability." The date as to which an applicant's insurability is to be measured, however, is the date on which the individual applied for reinstatement and tendered payment for all premiums due. (See *Funk* v. *Franklin Life Insurance Company* (7th Cir. 1968) 392 F.2d 913, 917.) The company cannot deny reinstatement simply because the insured might have incurred some disability after that date but before he completed the application form.

ment and return the premium. In other words, if an insurer retained an absolute discretion to approve or disapprove reinstatement throughout the period, an insured would have purchased rather unique insurance in which the "umbrella" of coverage would be open only in the sunshine and would close automatically at the first sign of rain.[15]

The defendant's handling of plaintiffs' reinstatement fully portrays the above proposition. Initially, the company clearly indicated that if it did approve reinstatement, it expected to be paid for "coverage" extended during the period when it was still determining whether or not to reinstate. In its letter of December 13, 1966, the company observed that if reinstatement were allowed, the premiums it had already received would provide coverage "to March 17, 1967." Since the insurer at the time was retaining premiums for two quarters of the coverage, this statement demonstrates that the company intended to keep these premiums for risks ostensibly assumed while it was deciding on reinstatement. When the company thereafter discovered that the very risks for which the policy was sought had occurred, however, the insurer changed its position, gave up any claim to the premiums for the period and denied reinstatement of the policy.

The insurance company cannot resort to this "heads I win—tails you lose" tactic; our *Kennedy* decision forecloses it. ■ Under *Kennedy* the insurer does not retain absolute discretion to disapprove application for reinstatement; so long as an applicant's insurability "would be satisfactory to a reasonable insurer," and he has paid all back premiums, reinstatement cannot be denied. ■ Under this standard, we emphasize that an insurer that acts within a reasonable time, may, of course, deny reinstatement to all who are uninsurable at the time they seek reinstatement; thus, an individual who becomes ill or disabled after his policy has lapsed cannot

---

[15]On several occasions in the past our courts have responded hostilely to insurance companies' attempts "to have it both ways." The most common situation involves an insurer's immediate acceptance of an initial premium payment under an agreement providing that coverage is to begin on the date of application if the insurer thereafter approves the applicant's insurability. In *Wernecke* v. *Pacific Fidelity Life Ins. Co.* (1965) 238 Cal.App.2d 884, 887 [48 Cal.Rptr. 251], the Court of Appeal pointed out that such a provision "on the one hand permit[s] the company to apply the cash payment to a premium period commencing with the date of application, if [the company] approves issuance of the policy, because the applicant is insured during this time; and on the other hand permit[s] the company, by ultimate nonapproval, to deny existence of insurance during the same period." Declaring that "[e]ither the company has insured the applicant during the interim period or it has not . . ." (*id.*), the court concluded that by accepting the initial premium the company had extended coverage until such time as it notified the insured that his application had been rejected. (See also *Ransom* v. *Penn Mutual Life Ins. Co.* (1954) 43 Cal.2d 420, 425 [274 P.2d 633]; *Brunt* v. *Occidental Life Ins. Co.* (1963) 223 Cal.App.2d 179, 184-185 [35 Cal.Rptr. 492]. See generally Note, *Life Insurance Receipts: The Mystery of the Non-Binding Binder* (1954) 63 Yale L.J. 523.)

obtain coverage simply by applying for reinstatement. As we stated in *Kennedy*: "[I]f at the time the application was submitted the insurer would have been justified in rejecting the application, or in requiring further proof before reinstating the policy, it may do so even though the death [or other disability] of the insured has intervened. [Citation.]" (18 Cal.2d at p. 633.) (See *Funk* v. *Franklin Life Insurance Company* (7th Cir. 1968) 392 F.2d 913, 917.)

As discussed above, plaintiffs were concededly insurable when they tendered full payment of their premium and thus whether or not the company immediately "accepted" their premium plaintiffs were entitled to reinstatement as a matter of right.

In sum we conclude that the insureds' policy was reinstated and in full force and effect prior to their accident on November 11, 1966, on two independent grounds. First, we find that the insurer, by depositing the late premium payment, tendered by the insureds, without issuing a conditional receipt and without requesting an application for reinstatement, "accepted" the premium within the meaning of the policy's provisions, and thus reinstated the policy. The insurance company, an institutionalized operation, can hardly nullify that acceptance upon the proffered ground that its size prevents prompt individual attention to each payment received. We believe the transition from the more personalized relation of the insured and the insurer of yesterday to the bureaucratized one of today works the other way; the consumer is too often the frustrated victim of modern mechanized methods of doing business. Too often he is both overpowered by the institution and depersonalized into a mere number. Surely he should not be penalized in the instant case because of the incidence of hugeness.

The second basis for the decision rests upon the foundation case of *Kennedy* v. *Occidental Life Ins. Co.* (1941) 18 Cal.2d 627 [117 P.2d 3], which holds that an insurer cannot "arbitrarily or capriciously" deny reinstatement to its former insured who is objectively qualified for such reinstatement. The insurer here does not question that the Rymans at the time they sought reinstatement were in good health and properly tendered payment of the overdue premium; their showing thus entitled them to reinstatement. We apply the *Kennedy* principle to a policy for medical and hospital benefits, an area of risk where protection of the consumer is crucial in this day of high cost of such care.

The judgment is reversed.

Peters, J., Mosk, J., and Burke, J., concurred.

**SULLIVAN, J.,** Concurring and Dissenting.—I agree with the conclusion of the majority that, under the particular facts of this case, the company's conduct upon receipt of the late-tendered premium constituted "acceptance of the premium . . . without requiring in connection therewith an application for reinstatement" (Ins. Code, § 10350.4) and, therefore, operated to reinstate the lapsed policy.

However, I dissent from that portion of the opinion which goes on to hold, as an "independent ground" of decision, that *whether or not* the company's conduct constituted "acceptance" within the meaning of the policy and the Insurance Code, plaintiffs were entitled to reinstatement upon tender of the late premium because they were insurable at that time according to some objective standard. This holding reaches beyond the facts immediately before us to gratuitously determine issues which, in light of the majority's primary holding, are not presented to us. In my view sound judicial policy should impel us to defer our consideration of those issues—as well as the possible application thereto of our decision in *Kennedy* v. *Occidental Life Ins. Co.* (1941) 18 Cal.2d 627 [117 P.2d 3]—until appropriate factual circumstances present a concrete basis for such consideration and provide an opportunity for informed argument by counsel.

Section 10350.4 of the Insurance Code sets forth the compulsory standard reinstatement provision which must be included[1] in all disability policies and was included in the policy here in question. That provision, which is fully set forth in footnote 5 of the majority opinion, delineates the two ways in which reinstatement of a lapsed disability policy may occur, depending upon whether or not the insurer requires the policy holder to submit an application for reinstatement. Thus, if the insurer *does not* require that such an application be submitted, the policy is reinstated upon its acceptance of the late-tendered premium.[2] However, if the insurer *does* require that an application for reinstatement be submitted, and issues a conditional receipt for the late tendered premium, then according to the compulsory provision the policy is reinstated (a) upon approval by the insurer of the completed application or, (b) in the absence of such formal approval, upon the insurer's failure to give notice of disapproval within 44 days of the issuance of the conditional receipt.[3]

---

[1]In an exception not here applicable the statute declares that the last sentence of the compulsory provision may be omitted from a noncancellable policy.

[2]"If any renewal premium be not paid within the time granted the insured for payment, a subsequent acceptance of premium by the insurer . . . without requiring in connection therewith an application for reinstatement, shall reinstate the policy. . . ."

[3]"[I]f the insurer . . . requires an application for reinstatement and issues a conditional receipt for the premium tendered, the policy will be reinstated upon approval

Briefly stated, the primary holding of the majority opinion is that in the particular circumstances of this case the conduct of the insured, as a matter of law, constituted acceptance of the late-tendered premium check without requiring an application for reinstatement. Accordingly such acceptance operated to reinstate the lapsed policy pursuant to the first method set forth in section 10350.4 and in the policy provisions.

As indicated above, I agree with that conclusion.[4] However, in the remainder of its opinion the majority proceed further to examine the case upon the assumption that the insurer's conduct *did not* bring about reinstatement in the above way. Rather, part 3 of the opinion assumes that the insurer *did not* accept the late-tendered premium without requiring an application for reinstatement and concludes that *nevertheless* reinstatement of the policy was effectuated because the plaintiffs were insurable at the time they sent the late-tendered premium.

It is an inescapable fact, although the majority would avoid emphasizing it, that the second ground of their decision is in reality a definitive interpretation of what I shall call for the sake of brevity the second part of the policy provision. (See fn. 3, *ante,* and accompanying text.) As I have pointed out, the essential ingredients of this part are: (a) the issuance of a conditional receipt for the late premium, and (b) the requiring of a completed application for reinstatement.

Thus, in the context of a case involving the unconditional acceptance of the premium as a matter of law, the majority announce legal rules which will be fully applicable to cases wherein, unlike the instant one, the insurer *does not accept* the late-tendered premium unconditionally but rather, in accordance with the provision, *issues a conditional receipt and requires that the insured fill out an application for reinstatement.* Such an insurer reading the provision would certainly conclude that reinstate-

---

of such application by the insurer or, lacking such approval, upon the forty-fifth day following the date of such conditional receipt unless the insurer has previously notified the insured in writing of its disapproval of such application."

[4] I agree generally, of course, with the majority's underlying rationale but I cannot endorse all of the language used by them. For example, I am not in accord with the majority's terse dismissal of the insurer's argument that the realities of large, modern insurance companies necessitate some time-lag in processing premium payments. While I recognize that the statute makes no provision for retention of tendered premiums, pending a decision by the insurer as to whether it will require a formal application, I am not about to join in an unsympathetic rejection of defendant's point on the simplistic basis that defendant is big by its own choice and must take the consequences. Bigness is a business fact of life—in banking, merchandising and a host of other activities including insurance—and the conduct of business should be fairly evaluated in the totality of these circumstances.

ment would not occur until it either had approved the completed application or had failed to disapprove it within 44 days of the issuance of the conditional receipt.

The majority, although holding as a matter of law that this second part of the reinstatement provision is not involved in the case at bench, unnecessarily embark on an extensive disquisition concerning it. The net effect of this is to instruct all insurers who may prudently decide to follow this portion of the reinstatement provision (i.e., by issuing conditional receipts and requiring applications for reinstatement) that their expectations in this respect are no longer justified and that such conditional receipt and reinstatement application will be of no effect whatsoever in a case where the insured is objectively insurable at the time he tenders his delinquent premium. Whether or not such a prudent insurer might be surprised to learn this in a concrete case in which his interests have been represented and his arguments advanced, surely he must be astonished to make the discovery in the instant case.

To take a specific example from among the many that may be conjured up, suppose that the insured sends his late-tendered premium on January 1; that the insurer receives the premium on January 2 and *immediately* sends to its insured a conditional receipt and an application for reinstatement together with a letter advising the insured that under the compulsory reinstatement provision in the lapsed policy the application must be filled out and submitted to the insurer before the policy can be reinstated; that the former insured receives the letter, conditional receipt, and application on January 3; and that on January 4, before the insured has filled out the application, he has an accident and suffers injuries. In such a case the insurer, relying upon the plain language of the provision (see fn. 3, *ante*), would deny liability. But to little avail: the majority have decided that case already. If the insured was insurable according to some objective standard on January 1, the insurer's attempt to insist upon evidence of insurability in accordance with the compulsory provision will be just that much wasted effort.

Suppose that the accident occurred on January 25, the application for reinstatement having languished on the insured's desk since it was received on January 3. Again the result required by the opinion of the majority in this case is clear: if the insured was insurable on January 1, he is covered.

Suppose that on January 2, the day it receives the late-tendered premium, the insurer determines that it will no longer insure heavy smokers, and that the former insured is a heavy smoker. If I understand the majority correctly, they would hold that the former insured was covered—even though

the application remained untouched on his desk when he suffered a heart attack on January 25.

I offer no present opinion on the merits of the hypothetical cases suggested. Those cases are not before us. I do maintain that we should refrain from announcing, as an "alternative holding" wholly unnecessary to the determination of the instant case, a broad rule which has the effect of deciding all such cases in advance. Surely we should not be so insensitive to future arguments which may be made to the effect that, in the circumstances of a particular case, the plain language of the compulsory reinstatement provision retains some legal vitality.

In their eagerness to announce a broad rule of universal application, the majority grievously overstate the holding of our decision in *Kennedy* v. *Occidental Life Ins. Co., supra,* 18 Cal.2d 627. That holding, properly stated, is simply this: When an insured has a contractual right of reinstatement under the terms of his policy, *and he fulfills all of the conditions made requisite to the exercise of that right by such policy terms,* the policy is revived and reinstated *eo instanti* even though the insurer's normal routine for approval is not yet completed.

In *Kennedy* the conditions of reinstatement required by the policy were the submission to the insurer within five years of default of (1) satisfactory evidence of insurability, and (2) all overdue premiums plus interest. The insured complied with these conditions before he died, and we held that the lapsed policy was thereupon reinstated. "When the insured has paid all overdue premiums with interest and has furnished in good faith and satisfactory form all the evidence of insurability required by the insurer, the original policy is revived and the insurer *having received all he bargained for in that policy,* should be liable for any loss thereafter occurring to the same extent as if the policy had never lapsed." (Italics added.) (18 Cal.2d at p. 634.)

By an interesting process of reasoning the majority transform this modest holding into an instrument of wholesale decision-making. *First,* rather than looking to the terms of the policy in question in order to determine what are the applicable conditions of reinstatement, they assume that the conditions of reinstatement in the instant case are identical to those in *Kennedy,* i.e., (1) providing evidence of insurability, and (2) payment of premiums.[5] *Second,* recognizing that the first of these conditions was not

---

[5]Reference to the terms of the policy—specifically the compulsory reinstatement clause—would of course reveal that the conditions of reinstatement differ according to whether or not the insurer requires that an application for reinstatement be sub-

here met, the majority conclude that this omission was excused or justified because the insurer failed to give adequate notice that an application would be required,[6] and, moreover, because in any event the insistence upon an application-for reinstatement containing evidence of insurability "attributes an undue significance to the reinstatement application *form* rather than the substantive factor of *insurability*." (Majority opn., *ante,* p. 634; original italics.) *Third and finally,* the majority conclude that because the policy holders in the instant case were insurable when they sent their premium, the lapsed policy was reinstated at that moment.

The sum of this reasoning is a rule of exaggerated simplicity which exhibits little resemblance to its alleged forbear: When one formerly insured under a lapsed policy of insurance tenders all premiums which would have been due under that policy, and the former insured is "objectively insurable" at that time, the policy is reinstated immediately. The fact that the Insurance Code and the compulsory reinstatement provision give the insurer an option *either* (1) to accept the late-tendered premium unconditionally, *or* (2) to issue a conditional receipt for the late-tendered premium and demand that an application be submitted—this fact, the majority say, is irrelevant. Although, they assure us, the company remains free to require its insured to complete formal applications for reinstatement evidencing insurability (see majority opn., *ante,* p. 634, fn. 14), the failure to submit such an application is of no moment whatsoever if the insured is "objectively insurable" when he sends his check. Thus, whereas under *Kennedy* an insured might be careful to fulfill all conditions of reinstatement set forth in the policy, under the instant case he need no longer be so concerned: if he is healthy when he sends his check, he is insured.

The majority express grave concern that any contrary rule would have "unconscionable" and "inequitable" results. They point out that if insurability is not determined as of the moment when the former insured submits his past due premiums, the insurer "ha[s] it both ways" because he has the benefit of the premium without the risk of loss. In other words, if an insured-against risk does not materialize during the review period the insurer retains the premium as if there had been coverage during the period,

---

mitted. If the insurer accepts the late-tendered premium without requiring such an application, evidence of insurability is *not* a condition of reinstatement. and the party is insured from the date of acceptance *whether or not* he is insurable at that time. If the insurer issues a conditional receipt and demands that an application for reinstatement be submitted, then evidence of insurability is a condition of reinstatement if the application requests such evidence, as presumably it will.

[6]The difference between this conclusion and the majority's first alternative holding (i.e., that the insurer's conduct constituted acceptance of the late-tendered premium without requiring an application for reinstatement) is elusive to say the least.

but if such a risk does materialize the insurer simply declines to reinstate. I would make two brief observations concerning this problem.

In the first place we cannot overlook the fact that the compulsory reinstatement provision here in issue is embodied in a *statute* adopted by the Legislature. That statute says in plain language that if the insurer does not unconditionally accept a late-tendered premium but instead issues a conditional receipt therefor and requires an application for reinstatement, the policy is to be reinstated upon approval of the completed application or, lacking such approval, upon the forty-fifth day following the issuance of the conditional receipt unless the insured has disapproved the application. The statute also says that "Any premium accepted in connection with a reinstatement shall be applied to a period for which premium has not been previously paid, but not to any period more than 60 days prior to the date of reinstatement." Taken together, these provisions appear to authorize just what the majority fear. What needs to be emphasized, however, is that these are *statutory* provisions which must be upheld unless they are *unconstitutional*.

Secondly, assuming that our *Kennedy* decision can be read to state principles of constitutional dimension, that holding would be applicable in itself (i.e., without the strained extension which the majority propose) to forbid the disapproval of any application for reinstatement which demonstrated insurability on the date of its submission to the insurer. This would not, however, cover the case which the majority seem to have in mind— i.e., the case wherein the former insured suffers injury *before* he submits his application for reinstatement but *after* he tenders his late premium.

In conclusion I would emphasize that I express no present opinion on the substantive issues which the majority have seen fit to reach. It is my view that this case, which involves the insurer's unconditional acceptance as a matter of law of a late-tendered premium, is not the case to announce broad principles—necessarily of constitutional dimension—governing factual situations wherein the insurer effectively insists upon his statutory right to be provided a completed application for reinstatement. When a proper case does arise we should then avail ourselves of the informed argument of counsel on both sides of the issues in order to determine the extent to which the reinstatement provision made compulsory by section 10350.4 of the Insurance Code is valid.

Wright, C. J., and McComb, J., concurred.